**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————————————

**NEW YORK MERCANTILE EXCHANGE, INC.**,

        Plaintiff/
        Counterclaim-Defendant,

   **- against -**

**INTERCONTINENTALEXCHANGE, INC.**,

        Defendant/Counterclaimant.
————————————————————————————

**02 Civ. 9277 (JGK)**

<u>**OPINION AND ORDER**</u>

**JOHN G. KOELTL, District Judge:**

    The defendant, IntercontinentalExchange, Inc. ("ICE"),

brings this motion for summary judgment against the

plaintiff, New York Mercantile Exchange, Inc. ("NYMEX") on

NYMEX's claims of copyright infringement, arising under the

Copyright Act of 1976, as amended, 17 U.S.C. §§ 101 <u>et</u>

<u>seq.</u>; service mark infringement, arising under the trademark laws

of the United States, 15 U.S.C. §§ 1051 <u>et</u> <u>seq.</u>; ICE's

dilution of the NYMEX's marks under New York General Business

Law § 360-1 ("GBL"); and a state law claim of tortious

interference with contract between NYMEX and GlobalView, the

NYMEX-licensed vendor that provides NYMEX settlement prices

to ICE.[1]

    ICE argues that NYMEX's claim for copyright infringement

for use of its settlement prices fails for five reasons: (1)

---

[1] In its motion papers, NYMEX withdrew its Third Claim for Relief based on an alleged violation of the federal Anti-Dilution statute, 15 U.S.C. 1125(c), and relied solely on the Fourth Claim for Relief alleging a violation of the GBL.

the Copyright Office refused to register NYMEX's settlement prices, depriving the Court of subject matter jurisdiction over NYMEX's copyright claim;[2] (2) NYMEX's settlement prices are not copyrightable; (3) the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1 et seq., impliedly repeals the Copyright Act because the Commodity Futures Trading Commission ("CFTC") has the authority to regulate NYMEX's distribution of its settlement prices; (4) NYMEX cannot prove copyright infringement; and (5) ICE's use of NYMEX's settlement prices constitutes fair use.

ICE argues that NYMEX's service mark infringement claim under the federal trademark law fails because ICE's use of NYMEX's marks constitutes a fair use, and NYMEX's New York State trademark dilution claim must be rejected because NYMEX cannot establish a likelihood of dilution where the relevant consumer market consists entirely of sophisticated commercial entities. Finally, ICE contends that NYMEX cannot prove tortious interference with the NYMEX-GlobalView contract because ICE had no prior knowledge of the allegedly breached portion of that contract.[3]

_____

[2] The parties have since stipulated that the Court has subject matter jurisdiction over the copyright infringement claim. (See Stipulation and Order dated Mar. 7, 2005.)
[3] ICE originally asserted five counterclaims and nine affirmative defenses, the second of which was that NYMEX's claims are barred because NYMEX misused the copyright laws in order to harm its principal

2

NYMEX has cross-moved for partial summary judgment on the copyrightability of NYMEX settlement prices and on its claim of tortious interference with its contract with GlobalView. For the reasons stated below, ICE's motion for summary judgment is granted while NYMEX's cross-motion is denied.

## I.

This is a case about the settlement prices of two of NYMEX's futures contracts. Unless otherwise noted, the following facts are undisputed.

## A.

Plaintiff NYMEX is the world's "largest exchange for the trading of physical commodity futures contracts"--including for physical commodities such as natural gas and light sweet

---

competitor. NYMEX moved to dismiss ICE's counterclaims and Second Affirmative Defense pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(1). The First through Fourth Counterclaims, as well as the Second Affirmative Defense, were dismissed without prejudice to replead, and the motion to dismiss the Fifth Counterclaim alleging violations of the Lanham Act was denied. See New York Mercantile Exchange, Inc. v. Intercontinental Exchange, Inc., No. 02 Civ. 9277, 2003 WL 22281573, at *3 (S.D.N.Y. Aug. 13, 2003).

ICE's First Amended Counterclaims then alleged four causes of action. NYMEX's motion to dismiss ICE's First Amended Counterclaims was granted with respect to ICE's First, Second, and Third Counterclaims. See New York Mercantile Exchange, Inc. v. Intercontinental Exchange, Inc., 323 F. Supp. 2d 559 (S.D.N.Y. 2004). ICE's Fourth Counterclaim sought a declaratory judgment that NYMEX does not have a copyright in its settlement prices, or alternatively, that NYMEX cannot enforce such a copyright against ICE, or that ICE has not infringed any such copyright. See id. at 560. The prior Opinion and Order noted that NYMEX's motion to dismiss the counterclaims did not address ICE's Fourth Counterclaim relating to NYMEX's copyright claim, and therefore that counterclaim could not be dismissed. See id. at 561 n.1.

crude oil--and for the trading of options on those commodity futures contracts. (Def.'s Rule 56.1 Stmt. ¶ 2; Pl.'s Rule 56.1 Counter-Stmt. ¶ 2.) NYMEX is a "Designated Contract Market" (the statutory term for a regulated futures exchange), and thus subject to the CEA and the jurisdiction of the CFTC. (Def.'s Rule 56.1 Stmt. ¶ 1; Pl.'s Rule 56.1 Counter-Stmt. ¶ 1.) Two of NYMEX's most successful futures contracts are those for Henry Hub natural gas and West Texas Intermediate ("WTI") crude oil. NYMEX's Henry Hub futures contract provides for delivery of natural gas at "Henry Hub," a natural gas pipeline operating system having its principal delivery point in Erath, Louisiana. NYMEX's WTI crude oil futures contract provides for delivery of West Texas crude oil in Cushing, Oklahoma. (Def.'s Rule 56.1 Stmt. ¶ 2; Pl.'s Rule 56.1 Counter-Stmt. ¶ 2.)

As part of its operations, a department of NYMEX acts as a clearing house (the "NYMEX Clearing House") for all of the commodity futures contracts and options traded over NYMEX's exchange. (Def.'s Rule 56.1 Stmt. ¶ 3; Pl.'s Rule 56.1 Counter-Stmt. ¶ 3.) Each party who trades futures contracts or options must post an initial margin deposit as a "performance bond" with a NYMEX clearing member in the form of cash or treasury bonds as an assurance that if the trader

loses on his or her trades, there will be adequate funds available to cover the losses. The individual clearing members stand behind the obligations of those who trade and clear through them, but as a last resort, the NYMEX Clearing House also stands behind each trade. (Def.'s Rule 56.1 Stmt. ¶ 4; Pl.'s Rule 56.1 Counter-Stmt. ¶ 4.) On each day on which a futures contract remains open and unexpired, the amount of the required margin deposit changes as the price of the underlying commodity--and thus the value of the contract- -changes. These changes in the value of the contract are determined by reference to the end-of-day "settlement prices" for the futures contract. (Def.'s Rule 56.1 Stmt. ¶ 5; Pl.'s Rule 56.1 Counter-Stmt. ¶ 5.)

**B.**

The parties dispute how the relevant settlement prices are calculated. NYMEX uses a Settlement Price Committee ("SPC") to assist in the determination of settlement prices for each futures contract traded over NYMEX. (Def.'s Rule 56.1 Stmt. ¶ 6.) According to NYMEX, the SPC does not merely assist in determining the settlement price for each futures contract, but rather determines the settlement price, pursuant to NYMEX's rules, through a process that reflects creativity and the exercise of judgment. (Pl. Rule 56.1

Stmt. ¶ 7.)  The SPC subcommittee for each type of commodity
meets to determine the settlement price soon after the close
of trading on NYMEX, which is 2:30 p.m. Eastern time.
(Def.'s Rule 56.1 Stmt. ¶ 7.)

NYMEX Exchange Rule 6.52 governs the determination of
WTI crude oil contracts settlement prices, while Rule 6.52A
similarly governs settlement price determinations for Henry
Hub natural gas contracts.  (Def.'s Rule 56.1 Stmt. ¶ 8;
Pl.'s Rule 56.1 Counter-Stmt. ¶ 8.)  Paragraph (A) of Rules
6.52 and 6.52A provides that the settlement price "shall be
the weighted average price (rounded to the nearest minimum
fluctuation) of all outright transactions in that delivery
month which occur in the closing range" where "(1) as of the
opening of business for that day has more than ten percent
(10%) of the total open interest for all delivery months of
the futures contract and (2) for which 10% of the closing
range volume in that commodity is done in that delivery month
. . .."  (See Pl. Ex. 1, 2.)  For the purposes of Paragraph
(A) of Rules 6.52 and 6.52A, the "closing range" is defined
as the last two minutes of trading at the end of each trading
day, except for the last day in which a contract trades, when
the closing range is the last thirty minutes of trading.
(Def.'s Rule 56.1 Stmt. ¶ 10.)

ICE maintains that the weighted average price applied to the trades occurring during the closing range can be expressed in a particular mathematical formula. (Def.'s Rule 56.1 Stmt. ¶ 11.) ICE further argues that the NYMEX SPC does not itself calculate the volume weighted average price of trades that were executed in the closing range, but rather relies on a back-office computer program. (Def.'s Rule 56.1 Stmt. ¶ 12-13.) ICE contends that shortly after the close of trading, NYMEX's SPC receives a printout from NYMEX's back office staff that reports the volume weighted average prices, which the SPC adopts as the settlement prices for the indicated contracts. (Def.'s Rule 56.1 Stmt. ¶ 17.)

NYMEX argues that a mathematical formula or computer program cannot account for the judgment and discretion used in determining settlement prices, such as the discretion needed for determining whether a particular trade, despite a time stamp, should be included in the closing range. (Pl.'s Rule 56.1 Counter-Stmt. ¶ 13, 14.) NYMEX also argues that the determination of the criteria for which month(s) the settlement price is to be a weighted average price, and the determination of which inputs are made in the weighting for such month(s), is a matter of discretion, judgment, and opinion of NYMEX and its SPC. (Pl.'s Rule 56.1 Counter-Stmt.

¶ 13.)  Furthermore, NYMEX notes that certain rule provisions (Rules 6.51(A), 6.52(C), and 6.52A(D)) allow either the SPC subcommittee or the individual NYMEX staff member on that subcommittee to override the weighted average price for both the Henry Hub and WTC futures contracts.  (Pl.'s Rule 56.1 Counter-Stmt. ¶ 6, 9; Pl.'s Ex. 1-2, 4.)

## C.

Whatever the dispute as to the amount of discretion used by NYMEX in determining its settlement prices, there is no dispute that NYMEX disseminates its settlement prices through licensed market data vendors who distribute them for a fee or without charge to subscribers.  (Def.'s Rule 56.1 Stmt. ¶ 36; Pl.'s Rule 56.1 Counter-Stmt. ¶ 36.)[4]  One such vendor is GlobalView Software, Inc. ("GlobalView"), who on August 7, 2000 received from NYMEX a limited, worldwide, non-exclusive license with respect to "NYMEX Market Data"--which includes NYMEX settlement prices--pursuant to a Market Data Agreement ("MDA").  (Def.'s Rule 56.1 Stmt. ¶ 39; Pl.'s Rule 56.1 Counter-Stmt. ¶ 39; see also MDA, attached as Ex. 23 to

---

[4] NYMEX also distributes settlement prices through its website and to certain national newspapers such as the New York Times and the Wall Street Journal for publication in the ensuing day's edition of these newspapers, although not all settlement prices are actually published. (Def's Rule 56.1 Stmt. ¶¶ 34, 35; Pl.'s Rule 56.1 Counter-Stmt. ¶¶ 34, 35.)

Declaration of Bradley P. Smith dated Sept. 2, 2004 ("Smith Decl.").)

The MDA permits GlobalView to electronically disseminate NYMEX Market Data to its subscribers subject to the terms of the Uniform Subscriber Addendum ("USA"). (Def.'s Rule 56.1 Stmt. ¶ 40; Pl.'s Rule 56.1 Counter-Stmt. ¶ 40; see also MDA ¶ 3.1.) The MDA divides NYMEX Market Data into three categories: (i) Real Time NYMEX Market Data, defined as NYMEX Market Data that is redistributed to a subscriber within thirty minutes after GlobalView's receipt of such data; (ii) Intermittent Real Time NYMEX Market Data, defined as NYMEX Market Data that is redistributed more than two minutes but less than thirty minutes after GlobalView's receipt of such data; and (iii) Delayed NYMEX Market Data, defined as NYMEX Market Data that is redistributed to a Subscriber more than thirty minutes after GlobalView's receipt of such data. (Def.'s Rule 56.1 Stmt. ¶ 41; Pl.'s Rule 56.1 Counter-Stmt. ¶ 41; see also MDA ¶¶ 1.5.1-.3.)

The MDA states that GlobalView "will not furnish Real Time or Intermittent Real Time NYMEX Market Data to any of its Subscribers until a Uniform Subscriber Addendum (the "Addendum") . . . has been executed by the Subscriber and returned to Vendor." (MDA ¶ 3.1.) The MDA provides that

"NYMEX Market Data shall be furnished to a Subscriber only in accordance with the terms of this Agreement and the Addendum," and requires a vendor to use reasonable efforts to ensure that its subscribers comply with the terms of the USA. (See MDA ¶ 3.1.) NYMEX alleges that GlobalView failed to comply with both Paragraph 7.8 and Exhibit C to the MDA by not reporting to NYMEX that ICE was redistributing NYMEX settlement prices to London Clearing House.[5] Exhibit A to the MDA contains a representation by GlobalView that GlobalView was not furnishing NYMEX Market Data to any subscriber who was redistributing NYMEX Market Data to anyone by digital datafeeds. (See MDA Ex. A.) According to NYMEX, ICE falsely stated to GlobalView that ICE was using NYMEX settlement prices only for ICE's internal purposes. (Pl.'s Rule 56.1 Counter-Stmt. ¶ 42.)

**D.**

ICE started business operations in August 2000. Since August 2000, ICE has operated an online Internet-based platform for the trading of over-the-counter ("OTC") derivative contracts, including commodity derivative

---

[5] Paragraph 7.8 of the MDA provides that, "Vendor will provide the information required pursuant to Exhibit C attached hereto and made a part hereof." Exhibit C attached to the MDA provides that vendors must submit certain information to NYMEX on an annual basis, including updated descriptions of the vendors' use and distribution of NYMEX Market Data.

contracts.  (Def.'s Rule 56.1 Stmt. ¶ 43; Pl.'s Rule 56.1
Counter-Stmt. ¶ 43.)  All of the participants on ICE's
trading platform are required to be "eligible commercial
entities" under the CEA, which defines that term to include
commercial or institutional market participants that satisfy
certain requirements.  (Def.'s Rule 56.1 Stmt. ¶ 44; Pl.'s
Rule 56.1 Counter-Stmt. ¶ 44.)  From the commencement of
trading on ICE in October 2000 until March 2002, ICE offered
market participants an "execution-only" (or "bilateral")
facility in energy futures, including WTI crude oil and Henry
Hub natural gas, with no clearing alternative.  (Def.'s Rule
56.1 Stmt. ¶ 45.)  Cleared OTC contracts offered by ICE since
March 2002 were cleared, not by ICE itself, but rather by
London Clearing House ("LCH").  (See Deposition of David
Goone dated Apr. 8, 2004 at 161-2 attached to Vol. II,
Declaration of Herbert C. Ross, Jr. dated Nov. 12, 2004
("Ross Decl."); Deposition of Charles Mackie dated Feb. 24,
2004 ("Mackie Dep.") at 31-35 attached to Vol. II, Ross
Decl.)  NYMEX alleges that from in or about March 2002
through the present, ICE has unlawfully reproduced NYMEX's
settlement prices each day that NYMEX settlement prices are
created, and that ICE has transmitted those reproductions on
the same day to LCH for the clearing of ICE's Henry Hub

natural gas and WTI crude oil OTC contracts.  NYMEX contends

that this process increases the commissions that ICE receives

for execution services in connection with trades performed on

ICE's platform.  NYMEX further alleges that ICE's use of

NYMEX settlement prices are not for ICE internal business

purposes, and that ICE's use of NYMEX settlement prices free-

rides on NYMEX's settlement prices, reputation, and goodwill

each day. (Pl.'s Rule 56.1 Counter-Stmt. ¶ 45.)

       According to ICE, an OTC swap is generally defined as an

agreement whereby a floating price is exchanged for a fixed

price over a specified period, thus allowing a buyer or

seller of energy products to "lock in" a specific price and

avoid the risk of floating prices.  The financial purpose of

an OTC transaction, therefore, is usually the same as the

financial purpose of a NYMEX transaction.  (Def.'s Rule 56.1

Stmt. ¶ 46) (internal citations and quotation marks omitted).

In drafting OTC swap contracts, ICE contends that market

participants frequently refer to NYMEX's settlement prices.

(Id. ¶ 47.)  NYMEX concedes that market participants often

provide that the parties will refer to a NYMEX settlement

price to serve as the final settlement price in OTC

contracts.  (Pl.'s Rule 56.1 Counter-Stmt. ¶¶ 46-7.)

The International Swaps and Derivatives Association
("ISDA") provides market participants with form swap
agreements that may contain explicit references to NYMEX's
prices, including the terms "NATURAL GAS – HENRY HUB – NYMEX"
and "OIL – WTI - NYMEX." (Def.'s Rule 56.1 Stmt. ¶ 48.)
NYMEX concedes that ISDA provides a form of OTC contract in
which the parties may choose to refer to a NYMEX settlement
price among a number of other alternative price references to
serve as the final settlement price between the parties.
(Pl.'s Rule 56.1 Counter-Stmt. ¶ 48.) NYMEX does not dispute
that many market participants in the energy derivatives
trading industry refer to NYMEX's settlement prices for its
WTI and Henry Hub futures contracts as a benchmark price in
their bilateral OTC contracts. (Def.'s Rule 56.1 Stmt. ¶¶
52, 57; Pl.'s Rule 56.1 Counter-Stmt. ¶¶ 52, 57.) While
NYMEX alleges that the conduct of other market participants
does not rise to the level of use of NYMEX settlement prices
by ICE, NYMEX does not dispute that market participants trade
OTC contracts that are based on NYMEX settlement prices,
which are often called "NYMEX look-alikes" in the industry.
(Def.'s Rule 56.1 Stmt. ¶ 54; Pl.'s Rule 56.1 Counter-Stmt. ¶
54.)

In facilitating bilateral OTC transactions, ICE does not make use of NYMEX settlement prices, but does use the words "New York Mercantile Exchange" and "NYMEX" to specify the final price that a particular OTC contract settles on. (Def.'s Rule 56.1 Stmt. ¶¶ 58-9; Pl.'s Rule 56.1 Counter-Stmt. ¶¶ 58-9.) The parties to an ICE swap contract agree to "swap" the price that the contract is entered into (the "fixed price") for the price of the underlying commodity at a certain date in the future (the "floating price"). Unlike NYMEX's futures contracts, ICE's Henry Hub and WTI swaps contracts are financial instruments that do not provide for physical delivery. (Def.'s Rule 56.1 Stmt. ¶ 60.) ICE's Henry Hub swap contract specifications define the floating price for that contract as "[a] price in USD per MMBtu dry equal to the monthly last settlement price for natural gas futures as made public by the New York Mercantile Exchange (NYMEX) for the month of production per ISDA commodity definitions." (Def.'s Rule 56.1 Stmt. ¶ 61.) ICE's WTI swap contract specifications define the floating price for that contract as "[a] price in USD per barrel equal to the monthly last settlement price for WTI crude futures as made public by the [NYMEX] for the month of production per ISDA commodity definitions." (Def.'s Rule 56.1 Stmt. ¶ 62.) ICE's contract

specifications are published on its website.  (Def.'s Rule
56.1 Stmt. ¶ 63; Pl.'s Rule 56.1 Counter-Stmt. ¶ 63.)  ICE
contends that its use of the words "New York Mercantile
Exchange" and "NYMEX" is based upon the ISDA definitions and
the practice of market participants in the energy derivatives
industry.  (Def.'s Rule 56.1 Stmt. ¶ 64.)  NYMEX quarrels
with any conclusions that could be drawn from ICE's use of
the terms "New York Mercantile Exchange" and "NYMEX," but has
not disputed the facts concerning ICE's use of those terms.
(Pl.'s Rule 56.1 Counter-Stmt. ¶¶ 61-62, 64.)

    In early 2002, ICE announced that it had entered into an
understanding with LCH to provide clearing house services in
connection with swaps based on Henry Hub natural gas and WTI
crude oil.  Trading in these contracts commenced in March
2002.  (Def.'s Rule 56.1 Stmt. ¶ 65; Pl.'s Rule 56.1 Counter-
Stmt. ¶ 65.)  LCH, like the NYMEX Clearing House, marks-to-
market all open contract positions each business day and pays
or collects variation margin from the contracting parties
depending on changes in market value.  (Def.'s Rule 56.1
Stmt. ¶ 66.)  ICE provides these prices to LCH.  ICE contends
that it uses NYMEX's settlement prices for Henry Hub natural
gas and WTI crude oil futures contracts when determining the
market prices for ICE's own swap contracts because the NYMEX

15

settlement prices are widely accepted benchmarks. (Def.'s
Rule 56.1 Stmt. ¶ 67.)

NYMEX responds that ICE reproduces and labels, as ICE's
own, the NYMEX settlement prices for NYMEX's Henry Hub
natural gas and WTI crude oil futures contracts. The only
time that ICE allegedly changes a NYMEX settlement price is
when ICE has a transaction in the same delivery month during
its closing range, and calculates a weighted average that is
different from the NYMEX settlement price for the same
delivery month. In such cases, ICE moves the NYMEX
settlement price one "tick" (equivalent to one cent for crude
oil and one-tenth of one cent for natural gas) closer to the
ICE weighted average. ICE uses the result of that one-tick
movement as its settlement price for that month, which it
then forwards, with reproductions of the NYMEX settlement
prices for the other delivery months, to LCH. LCH uses these
settlement prices to clear ICE Henry Hub natural gas and WTI
crude oil swap contracts. (Pl.'s Rule 56.1 Counter-Stmt. ¶¶
66, 67.) As in the case of its bilateral contracts, ICE
refers to the words "New York Mercantile Exchange" and
"NYMEX" in its contract specifications on its website to
describe the final price at which its Henry Hub natural gas

and WTI crude oil contracts settle.  (Def.'s Rule 56.1 Stmt.
¶ 68.)

ICE entered into a Proposal and a Software License with
GlobalView, both dated January 17, 2002 (collectively, the
"ICE-GlobalView Contract").  (Def.'s Rule 56.1 Stmt. ¶ 69;
Pl.'s Rule 56.1 Counter-Stmt. ¶ 69.)  ICE entered into the
ICE-GlobalView Contract in order to obtain NYMEX settlement
prices in connection with LCH's clearing function.  (Def.'s
Rule 56.1 Stmt. ¶ 70; Pl.'s Rule 56.1 Counter-Stmt. ¶ 70.)
The ICE-GlobalView Contract contemplates that GlobalView will
provide ICE with NYMEX settlement prices.  The Proposal
expressly provides that ICE may use these prices "for
internal use within its database and clearing system."
(Def.'s Rule 56.1 Stmt. ¶ 71; Ex. 19 to the Declaration of
Bradly Smith dated Sept. 2, 2004 ("Smith Decl."), at GV0052.)
NYMEX responds that ICE did not tell GlobalView that ICE
would distribute reproductions of NYMEX settlements prices to
LCH, and that, in fact, ICE fraudulently misrepresented to
GlobalView that NYMEX settlement prices would be used
internally at ICE.  ICE allegedly misled LCH by advising LCH
that ICE would determine ICE settlement prices by using many
sources of price information.  (Pl.'s Rule 56.1 Counter-Stmt.
¶ 70.)  NYMEX further alleges that by forwarding

reproductions of NYMEX's settlement prices to LCH, ICE was
making an external use of NYMEX's settlement prices.  (Pl.'s
Rule 56.1 Counter-Stmt. ¶ 71.)

During negotiations over the ICE-GlobalView Contract,
GlobalView did not provide ICE with a copy of the NYMEX-
GlobalView MDA.  Emma Vine, a Vice President of Sales at
GlobalView, stated that she did not give a copy of the
agreement between NYMEX and GlobalView to ICE and that to her
knowledge, no one from GobalView provided a copy to ICE.
(Def.'s Rule 56.1 Stmt. ¶ 72-3; Deposition of Emma Vine dated
Apr. 7, 2004 at 117 attached to Vol. II, Smith Decl. ("Vine
Dep.").)  Moreover, R.J. Cummings, an ICE Project Manager,
and Charles Vice, CEO of ICE, each testified that they did
not recall receiving a copy of the agreement between NYMEX
and GlobalView.  (Deposition of R.J. Cummings dated Jan. 21,
2004 at 120, attached as Ex. 30 to Vol. II, Smith Decl.
("Cummings Dep."); Vice Deposition dated Apr. 13, 2004 at
239-40, attached as Ex. 44 to Vol. II, Smith Decl.)  ICE was
aware, however, that GlobalView had entered into a
restrictive market data agreement with NYMEX.  (Ex. 20 to
Smith Decl., at ICE 0013461, ¶ 3(a).)

GlobalView told ICE that signing a Uniform Subscriber
Addendum ("USA") was necessary if ICE wanted to receive Real

Time Data.  (Def.'s Rule 56.1 Stmt. ¶ 74; Pl.'s Rule 56.1

Counter-Stmt. ¶ 74.)  GlobalView did not require ICE to sign

a USA when ICE indicated that it wanted Delayed Data.

(Def.'s Rule 56.1 Stmt. ¶ 75; Vine Dep. at 78; Cummings Dep.

at 105-06.)[6]  ICE always received NYMEX settlement prices

from GlobalView on a Delayed Data basis, although NYMEX

points out that ICE received NYMEX prices from another vendor

on a real-time basis.  (Pl.'s Rule 56.1 Counter-Stmt. ¶ 76.)

ICE has a Settlement Price Committee ("ICE SPC") that

determines the settlement prices for each of ICE's Henry Hub

and WTI swap contracts according to established practices.

NYMEX argues that ICE's SPC for natural gas and crude oil has

minimal participation and merely adopts reproductions of the

NYMEX settlement process for Henry Hub and WTI futures

contracts.  According to NYMEX, the only time that ICE makes

any change to a NYMEX settlement price is when ICE uses its

"one-tick rule," as explained above.  (Def.'s Rule 56.1 Stmt.

¶ 81; Pl.'s Rule 56.1 Counter-Stmt.¶ 81.)

Once settlement prices are calculated for ICE swap

contracts, ICE transmits them to LCH, which uses them to

clear the ICE swap contracts.  LCH pays or deducts variation

---

[6] NYMEX points out that ICE did not explain to GlobalView that ICE would
provide the market data to LCH.  NYMEX does not point to any evidence
that this was the reason GlobalView did not require a Uniform Subscriber
Addendum, rather than the stated reason that the USA was not required for
the receipt of Delayed Data.

margin depending on the change in the price of a contract from the previous day. (Def.'s Rule 56.1 Stmt. ¶ 84; Pl.'s Rule 56.1 Counter-Stmt. ¶ 84.) ICE's settlement prices are made available to ICE participants on the ICE trading screen after LCH performs its clearing function. ICE participants must have a user ID and a password to access this information. (Def.'s Rule 56.1 Stmt. ¶ 85; Pl.'s Rule 56.1 Counter-Stmt. ¶ 85.) ICE alleges that it does not charge participants for access to its settlement prices. (Def.'s Rule 56.1 Stmt. ¶ 86; Pl.'s Rule 56.1 Counter-Stmt. ¶ 86.) ICE does not resell the NYMEX settlement prices or otherwise hold itself out as a vendor of NYMEX prices.[7] (Def.'s Rule 56.1 Stmt. ¶ 87.)

**E.**

On February 12, 2002, Christopher K. Bowen, NYMEX's Senior Vice President and General Counsel, wrote a letter to Jeffrey Sprecher, ICE's Chief Executive Officer, which alleged that "ICE's use of NYMEX settlement prices in arriving at 'floating prices' constitutes copyright

---

[7] NYMEX stresses that the vast majority of ICE settlement prices are reproductions of NYMEX settlement prices and challenges all statements by ICE that suggest that ICE determines its own settlement prices. In addition, NYMEX alleges that, by copying NYMEX's settlement prices for LCH's use and making the settlement prices available on the ICE trading screen, ICE receives increased revenues because it offers participants a clearing option on LCH and engages in the economic equivalent of selling NYMEX's settlement prices. (Pl.'s Rule 56.1 Counter-Stmt. ¶ 87.)

infringement . . . ." (Def.'s Rule 56.1 Stmt. ¶ 88; Pl.'s Rule 56.1 Counter-Stmt. ¶ 88.) At the time of Mr. Bowen's letter, NYMEX did not possess a copyright registration for its settlement prices, and had not applied to register those prices with the Copyright Office. (Def.'s Rule 56.1 Stmt. ¶ 89; Pl.'s Rule 56.1 Counter-Stmt. ¶ 89.)

On March 28, 2002, NYMEX's attorney, James E. Schatz submitted a number of documents to the United States Copyright Office via Federal Express, including: a letter from Mr. Schatz to Nannette Petruzzelli dated March 28, 2002 (see Smith Decl. Ex. 4; Deposition of James E. Schatz ("Schatz Dep. I") dated Feb. 13, 2004 at 45-47); a letter from Mr. Schatz to the Library of Congress dated March 28, 2002 (Smith Decl. Ex. 5 at 1; Schatz Dep. I at 45-47); a Form TX copyright application signed by Mr. Schatz and bearing the date March 28, 2002 (Smith Decl. Ex. 2); a document titled "Descriptive Statement for the NYMEX Database," dated March 28, 2002; and identifying material of the NYMEX Database consisting of printouts from the NYMEX Database (Smith Decl. Ex. 4 at 1). (Def.'s Rule 56.1 Stmt. ¶ 90; Pl.'s Rule 56.1 Counter-Stmt. ¶ 90.)

The subject line of Mr. Schatz's letter dated March 28, 2002 to Ms. Petruzzelli is "Application to Register the

Copyright in the Multiple-File Database (Web Site) of the New York Mercantile Exchange, Inc. ('NYMEX')". This letter states, in part:

> Per our discussion and later exchange of voice mails, we have provided the approximate number (although as exact as we could make it) of anonymous individual authors who are all members of both NYMEX "Settlement Committees" and NYMEX in Space 2b. These Settlement Committees, and their members, determine, on an every business day basis, what are called 'settlement prices' for the futures and options contracts that are traded on the NYMEX exchange. Such settlement prices are determined using NYMEX determined factors and parameters (that are original to NYMEX) and the educated judgment of Settlement Committee members. As such, settlement prices are original, educated judgments as to appropriate prices similar to the 'predictions . . . of expected values for 'average' vehicles' at issue in CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc., 44 F.3d 61 (2d Cir. 1994) and the 'prices which are compilations of data chosen and weighted with creativity and judgment' at issue in CDN, Inc. v. Kapes, 197 F.3d 1256 (9th Cir. 1999).

(Def.'s Rule 56.1 Stmt. ¶ 94; Pl.'s Rule 56.1 Counter-Stmt. ¶ 94.)

In Part 1 of the March 28 Form TX submitted in connection with NYMEX's March 28, 2002 Application, the "Title of this Work" was described as "NYMEX Database." In Part 2a, the "Name of the Author" was described as "New York Mercantile Exchange, Inc." and the "Nature of Authorship" was "Original text and compilation." In Part 2b, the "Name of Author" was described as "Approximately 136 anonymous

individual authors who are all members of NYMEX Settlement Committees and of NYMEX." Below that, the "Nature of Authorship" was described as "Determination of settlement prices as described in the accompanying Descriptive." (Def.'s Rule 56.1 Stmt. ¶ 95; Pl.'s Rule 56.1 Counter-Stmt. ¶ 95; Ex. 2 to Smith Decl.)

The March 28 Descriptive Statement submitted to the Copyright Office contains the following references to NYMEX's settlement prices under the heading "MARKETS SECTION":

2. Market Data

(A)   Contains text and data with information regarding the standard NYMEX futures and options contracts that are traded, how trading and reporting is handled by NYMEX, and various related information including termination schedules and margin details, and a variety of data (in a variety of quote, chart and other formats) regarding trading activity, prices for transactions, bid/asked activity and final "settlement prices" for each day of trading. Settlement prices are determined using NYMEX determined factors and parameters and educated judgment by Settlement Committees composed of NYMEX members. This text, data and information is compiled into the numerous subfiles described below by NYMEX employees.

(B)   Such text, data and information is authored and/or compiled by NYMEX employees except for settlement prices which are determined by NYMEX members and compiled by NYMEX employees.

(C)   Contains about 120,000 kilobytes of data.

***

4. Settlement Data/Futures and Options Data

This file has two major subfiles. The first is
"New Format - By Commodity." This subfile provides
yet another means to access the same text, data and
information as contained in the Market Data file.

The second major subfile is "Data on Complete list
of Exchange Contracts." The information following
is for this subfile:

(A)   Contains text, data and information regarding
      trading  activity,  prices  for  futures  and
      options   contracts   transactions   and  final
      "settlement prices" for each day of trading in
      six subfiles as described below. Settlement
      prices  are  determined  using  NYMEX-selected
      factors and parameters and educated judgment
      by  Settlement  Committees  composed  of  NYMEX
      members.

(B)   Such  text,  data  and  information  is  authored
      and/or compiled by NYMEX employees except for
      settlement  prices  which  are  determined  by
      NYMEX members and compiled by NYMEX employees.

(C)   Contains about 1,060 kilobytes of data.

(Ex. 3 to Smith Decl. at 4-5, 6.) In the course of making

NYMEX's March 28 Application to the Copyright Office, Mr.

Schatz had conversations with Nanette Petruzzelli. (Def.'s

Rule 56.1 Stmt. ¶ 97; Pl.'s Rule 56.1 Counter-Stmt.¶ 97.)

Ms. Petruzzelli was at all relevant times the Chief of the

Examining Division of the Copyright Office. (Def.'s Rule 56.1

Stmt. ¶ 98.)

NYMEX learned in April 2002 that the Copyright Office

would not grant NYMEX a copyright registration in response to

NYMEX's March 28 Application because that application contained an "explicit claim" of copyright in NYMEX settlement prices themselves.  NYMEX was apparently aware that the Copyright Office would reject the application entirely if NYMEX maintained its assertion that NYMEX settlement prices were copyrightable.  (See Deposition of James E. Schatz dated Feb. 13, 2004 attached as Ex. 12 to Supp. Declaration of Bradley P. Smith dated Dec. 17, 2004 ("Schatz Dep. II") at 80, 81.)  Accordingly, NYMEX withdrew its initial application to the Copyright Office and replaced it with an application that did not make an express claim as to the copyrightability of NYMEX settlement prices.  (Def.'s Rule 56.1 Stmt. ¶ 114; Pl.'s Rule 56.1 Counter-Stmt. ¶ 114; see also Schatz Dep. II at 110 (noting that NYMEX did not make explicit claims about the copyrightability of settlement prices in April 2002 application).)

On April 23, 2004, Mr. Schatz submitted various revised application documents for a second copyright application via Federal Express to the Copyright Office.  (Def.'s Rule 56.1 Stmt. ¶ 115; Pl.'s Rule 56.1 Counter-Stmt. ¶ 115.)  The letter from Mr. Schatz to Ms. Petruzzelli dated April 23, 2004 and the Form TX included in the Federal Express submission, made no express mention of the copyrightability

of NYMEX settlement prices and did not contain the discussion about the copyrightability of settlement prices contained in the March 28 letter. (Def.'s Rule 56.1 Stmt. ¶ 116-17, 119; Pl.'s Rule 56.1 Counter-Stmt. ¶ 116-17, 119.) The April 23 Form TX lists the only author in Section 2 as the "New York Mercantile Exchange, Inc." and that the "Nature of Authorship in Section 2 is described as "Original text and compilation."[8] (Ex. 7 to Smith Decl.) The April 23 Descriptive Statement also differs from the March 28 Descriptive Statement. (Compare Ex. 9 to Smith Decl. with Ex. 3 to Smith Decl.) The April 23 Descriptive Statement is similar to the prior Descriptive Statement but does not contain any statements made in the March 28 Descriptive Statement concerning how settlement prices are determined or whether judgment is involved in determining settlement prices. (Id.) NYMEX admits that it sought a copyright registration in the April 23 Application, in part, to sue ICE for its alleged copying of NYMEX settlement prices. (Def.'s Rule 56.1 Stmt. ¶ 128; Pl.'s Rule 56.1 Counter-Stmt. ¶ 128.) On April 24, 2002, the Copyright Office issued a copyright registration based on NYMEX's April 23, 2002 copyright

---

[8] NYMEX contends that the members of NYMEX's SPC had signed work-made-for-hire agreements that made NYMEX the author of settlement prices in the NYMEX Database. (Pl.'s Rule 56.1 Counter-Stmt. ¶ 120.)

application. (Def.'s Rule 56.1 Stmt. ¶ 130; Pl.'s Rule 56.1 Counter-Stmt. ¶ 130.)

Although the Copyright Office issued NYMEX a copyright registration for the NYMEX Database, effective April 24, 2002, ICE initially argued that the Court lacked subject matter jurisdiction to hear NYMEX's copyright infringement claim because the registration for the NYMEX Database is not a registration for NYMEX settlement prices. ICE also alleged that NYMEX had not served a notice of this action on the Copyright Office in accordance with 17 U.S.C. § 411(a), which, ICE argued, NYMEX should have done because its first application was allegedly "refused."[9]

The parties subsequently stipulated that NYMEX would serve a copy of the Amended Complaint, together with notice of this action, on the Register of Copyrights ("the Register") without prejudice to NYMEX's position that it has a valid copyright registration in NYMEX settlement prices

---

[9] Section 411(a) of the Copyright Act established registration as a prerequisite for a copyright infringement action. It also provides that "where the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form and registration has been refused, the applicant is entitled to institute an action for infringement if notice thereof, with a copy of the complaint, is served on the Register of Copyrights. The Register may, at his or her option, become a party to the action with respect to the issue of registrability of the copyright claim by entering an appearance within sixty days of such service, but the Register's failure to become a party shall not deprive the court of jurisdiction to determine that issue." 17 U.S.C. § 411(a). NYMEX had argued that no notice to the Register of Copyrights was necessary because its first application was not "refused," but was in fact withdrawn.

that gives the Court subject matter jurisdiction over its copyright infringement claims. Both parties now agree that NYMEX has served a copy of the Amended Complaint on the Register and that the Court has subject matter jurisdiction over the copyright infringement claim. (See Stipulation and Order dated Mar. 7, 2005.) The Register of Copyrights has submitted a Statement of Interest that opposes NYMEX's position that its settlement prices are copyrightable.

## II.

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it

does not extend to issue-resolution." *Gallo,* 22 F.3d at

1224.  The moving party bears the initial burden of

informing the district court of the basis for its motion and

identifying the matter that it believes demonstrates the

absence of a genuine issue of material fact.  *Celotex,* 477

U.S. at 323.  The substantive law governing the case will

identify those facts that are material and "only disputes

over facts that might affect the outcome of the suit under

the governing law will properly preclude the entry of

summary judgment."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477

U.S. 242, 248 (1986); <u>see also</u> <u>Consol. Edison, Inc. v.</u>

<u>Northeast Utilities</u>, 332 F. Supp. 2d 639, 642 (S.D.N.Y.

2004).

Summary judgment is appropriate if it appears that the

non-moving party cannot prove an element that is essential to

the non-moving party's case and on which it will bear the

burden of proof at trial.  <u>See</u> <u>Cleveland v. Policy Mgt. Sys.</u>

<u>Corp.</u>, 526 U.S. 795, 805-06 (1999); <u>Celotex</u>, 477 U.S at 322;

<u>Powell v. Nat. Bd. of Med. Exam'rs</u>, 364 F.3d 79, 84 (2d Cir.

2004).  In determining whether summary judgment is

appropriate, a court must resolve all ambiguities and draw

all reasonable inferences against the moving party.  <u>See</u>

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S.

574, 587 (1986) (citing United States v. Diebold, Inc., 369
U.S. 654, 655 (1962)); see also Gallo, 22 F.3d at 1223.
Summary judgment is improper if there is any evidence in the
record from any source from which a reasonable inference
could be drawn in favor of the nonmoving party.  See Chambers
v. T.R.M. Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).
If the moving party meets its initial burden of showing a
lack of a material issue of fact, the burden shifts to the
nonmoving party to come forward with "specific facts showing
that there is a genuine issue for trial."  Fed. R. Civ. P.
56(e).  The nonmoving party must produce evidence in the
record and "may not rely simply on conclusory statements or
on contentions that the affidavits supporting the motion are
not credible."  Ying Jing Gan v. City of New York, 996 F.2d
522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d
105, 114-15 (2d Cir. 1998); Consol. Edison, 332 F. Supp. 2d
at 643; see also Garvin v. Potter, 367 F. Supp. 2d 548, 553-
54 (S.D.N.Y. 2005).

### III.

ICE argues that NYMEX's copyright infringement claim
should be rejected because, among other reasons, NYMEX cannot
show that the settlement prices are copyrightable.  NYMEX
cross-moves for partial summary judgment on the

copyrightability of the settlement prices.  The Register of

Copyrights has also entered in a statement of interest,

arguing that NYMEX's settlement prices are not copyrightable.

**A.**

NYMEX contends that its individual settlement prices

constitute copyrightable subject matter because NYMEX

settlement prices are creative works of NYMEX and its SPC.[10]

Both the Register and ICE respond that NYMEX settlement

prices are not copyrightable based on the merger doctrine.

Under the merger doctrine, "if there is just one way to

express an idea, the idea and expression are said to merge,

and the expression is not protectable" under the copyright

laws.  Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 111

(2d Cir. 2001).  "The test is whether protection of

expression would inevitably accord protection to an idea."

Id. (internal citation and quotation marks omitted).  In this

case, the idea embodied by NYMEX individual settlement

prices--the price of a particular futures contract at the

close of trading--can only be expressed as a number.

---

[10] The parties dispute the extent that NYMEX and its SPC use creativity
and the exercise of judgment in determining the settlement prices.  For
purposes of this motion for summary judgment, the Court need not
determine the degree of creativity that goes into the setting of
individual prices.

It is a well-established that copyright "protection is given only to the expression of the idea--not the idea itself." <u>Mazer v. Stein</u>, 347 U.S. 201, 217 (1954). By statute, "In no case does copyright protection … extend to any idea, procedure, process, system, [or] method of operation . . . regardless of the form in which it is described, explained, illustrated, or embodied . . . ." 17 U.S.C. § 102(b).

Similarly, facts themselves, just as ideas, cannot be protected by copyright. As the Supreme Court explained: "That there can be no valid copyright in facts is universally understood. The most fundamental axiom of copyright law is that no author may copyright his ideas or the facts he narrates." <u>Feist Publications, Inc. v. Rural Telephone Service Co., Inc.</u> 499 U.S. 340, 344-345 (1991) (internal citation, alteration, and quotation marks omitted). The Supreme Court further instructed that: "[C]opyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work. This principle, known as the idea/expression or fact/expression dichotomy, applies to all works of authorship." <u>Id.</u> at 349-50 (internal citation omitted).

Moreover, to protect the free exchange of ideas, courts have also recognized that when expression is essential to conveying an idea, the expression of that idea will not be copyrighted because the expression has merged with the unprotectable idea.  The Second Circuit Court of Appeals has explained that "in order to protect the immunity of ideas from private ownership, when the expression is essential to the statement of the idea, the expression also will be unprotected, so as to insure free public access to the discussion of the idea."  CCC Info. Servs., Inc. v. Maclean Hunter Mkt Reps, Inc., 44 F.3d 61, 68 (2d Cir. 1994).

In this case, NYMEX argues that there is no single "correct" settlement price for any delivery month.  Rather, NYMEX alleges that its settlement prices are the result of the judgment and discretion of its SPC, which sets the standards used to determine the settlement prices and can influence the establishment of NYMEX settlement prices.  At oral argument, for example, NYMEX denied that a NYMEX settlement price is a fact and urged the Court to consider a NYMEX settlement price as a "creative copyrightable work" that, even after publication, does not "convert into a fact." According to counsel for NYMEX:  "[A NYMEX settlement price] never loses its status [as copyrightable].  What is done with

it, what we permit to be done with it, that's something else again.  It does not become a fact.  It retains its copyright status."  (Tr. dated Feb. 18, 2005 at 49.)

The argument that NYMEX settlement prices do not embody facts is without merit.  The numerical settlement price that arises from NYMEX's judgment and discretion reflects no more than a pure fact or idea of the present price of a futures contract.  Regardless of the level of judgment and creativity involved in determining each NYMEX settlement price, there is plainly only one settlement price for any given Henry Hub or WTI futures contract that is used by NYMEX to clear such contracts at a given time.  As NYMEX is a "Designated Contract Market," the NYMEX settlement prices are widely publicized and used as benchmarks by market participants. NYMEX settlement prices are thus real-world facts used by commodities traders to value their open positions and trigger margin calls or margin reductions.  The NYMEX settlement prices function as the actual price at which a futures contract must be settled or a commodity delivered by market participants.

Moreover, because NYMEX's settlement prices are the actual prices and are the only way to express the idea of a settlement price stated in numbers--the expression of the

price is therefore not sufficiently distinct from the idea of
the price to warrant copyright protection. The Court of
Appeals for the Sixth Circuit recognized this principle in
rejecting an effort to extend copyright protection to
transmission part numbers: "The mere fact that numbers are
attached to, or are a by-product of categories and
descriptions that are copyrightable does not render the
numbers themselves copyrightable." ATC Distribution Group,
Inc. v. Whatever It Takes Transmissions & Parts, Inc., 402
F.3d 700, 708-09 (6th Cir. 2005) (citing Southco, Inc. v.
Kanebridge Corp., ("Southco I"), 258 F.3d 148, 151 & n.5 (3d
Cir. 2001).

NYMEX relies heavily on the decision by the Second
Circuit Court of Appeals in CCC, 44 F.3d 61, which withheld
application of the merger doctrine and found copyright
protection for compilations of used car values. CCC is
distinguished from the present case.

In CCC, the Second Circuit Court of Appeals held that a
compendium of used car valuations was copyrightable. See
CCC, 44 F.3d at 72. According to the CCC court: "the takings
by CCC from the Red Book are of virtually the entire
compendium . . . The copying is so extensive that CCC
effectively offers to sell its customers Maclean's Red Book

35

through CCC's data base." Id. Under CCC, the wholesale
copying of compilation prices was barred. Moreover, the used
car valuations in the CCC compilation were recognized to be
"no more than predictions" of the editors of the Red Book,
id. at 73, and each subscriber was "the final judge of the
actual value of a particular vehicle." Id. at 63.

It is true that, in the course of its opinion, the Court
of Appeals noted that the individual valuations were original
creations. Id. at 67. However, in order to overcome the
idea/expression argument, the Court of Appeals relied on the
wholesale copying of the compilation as the infringing
activity. It was the compilation that was protected. In
this case, NYMEX did not seek a copyright registration for a
compilation and does not rely on the concept of compilations
to protect its settlement prices. (Tr. Of Feb. 18, 2005 at
45-46.) Therefore, CCC does not support NYMEX's argument.[11]

In this case, in contrast to CCC, ICE does not engage in
wholesale copying and sale of NYMEX settlement prices, but

---

[11] NYMEX also relies upon CDN Inc. v. Kapes, 197 F.3d 1256 (9th Cir. 1999).
In that case, the Court of Appeals for the Ninth Circuit relied upon CCC
and found that prices in a wholesale price guide for collectable coins
were subject to copyright protection. The Court of Appeals cited
compilation cases such as CCC and Feist, but analyzed the creativity of
individual prices. That case cannot be dispositive here because NYMEX
has disclaimed reliance on the compilation cases and there is no
reasonable way to find that NYMEX settlement prices can survive a
fact/expression or idea/expression analysis. As the Register of
Copyright argues, if the Ninth Circuit's decision in CDN can be read to
suggest that an individual price valuation is copyrightable, it is an
unsupportable extension of copyright.

rather, uses NYMEX settlement prices solely as the established benchmarks in the energy trading industry to facilitate the clearing of its own OTC swaps. Moreover, NYMEX is the final judge of the settlement prices that market participants to a NYMEX-based contract will use to value their positions and mark-to-market. NYMEX settlement prices are a matter of basic market fact, and therefore, they are not copyrightable. See Kregos v. Associated Press, 937 F.2d 700, 707 (2d Cir. 1991) ("[W]here a selection of data is the first step in an analysis that yields a precise result or even a better-than-average probability of some result, protecting the 'expression' of the selection would clearly risk protecting the idea of the analysis.")

Because NYMEX's idea of the settlement price and the fact of the settlement price used by market participants cannot be distinguished from its expression, the merger doctrine applies in this case. Accordingly, NYMEX's claim against ICE for copyright infringement of NYMEX settlement prices, which are not copyrightable, must be dismissed.

**B.**

The Register also contends that the extent to which NYMEX settlement prices constitute a creative work is

irrelevant because NYMEX settlement prices are also non-copyrightable words or short phrases.

The Copyright Office's long-standing practice is to deny copyright protection to words and short phrases,[12] and courts have found that the policies and interpretation of the Office are entitled to deference.  See Southco, Inc. v. Kanebridge Corp., ("Southco II"), 390 F.3d 276, 286-87 n.5 (3d Cir. 2004) (deferring to views of Copyright Office regarding short phrases because "[a]t a minimum, the practice of the Copyright Office "reflects a 'body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" (internal citation omitted)).  By its regulations, the Copyright Office has determined that certain material, including words and short phrases, are not subject to copyright.  See 37 CFR § 202.1.  This regulation concerning single words and short phrases was endorsed by the Court of Appeals for the Second Circuit.  Kitchens of Sara Lee, Inc. v. Nifty Foods Corp., 266 F.2d 541, 544 (2d Cir. 1959); see also Arica Institute, Inc. v. Palmer, 970 F.2d

---

[12] The Copyright Office's practice of denying registration to words and phrases dates back to at least 1899.  See Southco II, 390 F.3d at 285-86. (citation omitted)  The Copyright Office has also issued Circular No. 46, "Copyright for Commercial Prints or Labels."  (See Declaration of AUSA Nicole Gueron dated May 25, 2005, Ex. C.)  The Circular provides that, "to be entitled to copyright protection, a work must contain a substantial amount of original text or pictorial material."  Thus, "Brand names, trade names, slogans, and other short phrases or expressions cannot be copyrighted, even if they are distinctively arranged or printed."  (Id.)

38

1067, 1072 (2d Cir. 1992) (denying copyrightability as to single words or short phrases which do not exhibit the minimal creativity required for copyright protection). Relying on the short phrases regulation, the Register of Copyrights has refused to register copyrights in short sets of numbers--such as the numbers ascribed to tool parts-- because they do not "constitute[] copyrightable subject matter." 17 U.S.C. § 410. The Third and Sixth Circuit Courts of Appeals have agreed with the conclusion that short sets of numbers are not entitled to copyright protection, and have denied copyright protection to part numbers. See ATC Distribution Group, 402 F.3d at 708-10 (transmission part numbers not eligible for copyright protection); Southco II, 390 F.3d at 285-86 (tool part numbers excluded from copyright protection "because they are analogous to short phrases or the titles of works."); accord Sega Enterprises Ltd. v. Accolade, Inc., 977 F.2d 1510, 1524 n.7 (9th Cir. 1993) (20-byte initialization code is de minimus length and likely a word or short phrase not protected by copyright law pursuant to 37 CFR § 202.1(a).)

In this case, NYMEX attempts to distinguish Southco and ATC Distribution Group by arguing that those cases involve materially different facts and are thus inapposite. Southco

39

involved the copyright protection of numbers ascribed to parts (fasteners) manufactured by the plaintiff, but no creativity was claimed as to the numbers themselves, and the majority noted that "if any creativity were allowed to creep into the numbering process, the system would be defeated" and thus, the numbers themselves are generated by a mechanical application of the rules and do not reflect even a spark of creativity. Southco II, 390 F.3d at 282-83. ATC Distribution Group involved the same type of numbering of parts without creative input in assigning the numbers. NYMEX argues that, in contrast to both cases, NYMEX settlement prices reflect significant creativity.

However, NYMEX's distinctions do not relate to those portions of Southco II and ATC Distribution Group which found short phrases to fall outside the protection of copyright law. NYMEX's distinctions go to the issue of whether the prices were sufficiently original to warrant copyright registration, not to whether they were unprotectable short phrases. The reasoning in ATC Distribution Group and Southco II denying copyright protection for parts numbers applies with equal force to NYMEX settlement prices. A price expressed in dollars is recognized to be a form of "expression dictated solely at functional considerations."

CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc., 97 F.3d
1504, 1519 (1st Cir. 1996). If a NYMEX settlement price in
dollars constituted copyrightable subject matter, public
conduct would be limited, regardless of the use of the price
and regardless of the context. See Southco II, 390 F.3d at
286; ATC Distribution Group, 402 F.3d at 709. Although the
fair use doctrine might be used to protect users who had used
the copyrighted price, it would be highly inefficient to
litigate over the use of the price. See Smithkline Beechum
Consumer Healthcare, I.P. v. Watson Pharmaceuticals, Inc.,
211 F.3d 21, 29 n.5 (2d Cir. 2000) (describing use of
copyright protection in text as means to leverage control
over an uncopyrightable product and to harass competitors);
Southco II, 390 F.3d at 286; ATC Distribution Group, 402 F.3d
at 709. Accordingly, the short phrase analysis provides an
additional and compelling basis for the conclusion that
NYMEX's settlement prices are non-copyrightable and that
NYMEX's claim for copyright infringement must be dismissed.[13]

---

[13] Because NYMEX's settlement prices are not copyrightable, the Court does
not address ICE's additional arguments that the CEA impliedly repealed
the Copyright Act in the context of this action, or that ICE is engaged
in non-infringing fair use of NYMEX settlement prices. Nor does the
Court reach the issue of the effect of ICE's activity, if any, on NYMEX's
ability to sell its real-time pricing data.

NYMEX's Second Claim for Relief alleges violations of the Trademark laws of the United States, in particular, 15 U.S.C. §§ 1114(1) and 1125(a).  There is no dispute that NYMEX owns various service mark registrations for the service marks NYMEX and NEW YORK MERCANTILE EXCHANGE.  Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), generally protects registered marks against unauthorized use where such use is likely to cause confusion.  Similarly, section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1), prohibits any misrepresentation likely to cause confusion about the source of a product or service.  Section 43(a) protects unregistered trademarks similar to the way that section 32(1) protects registered marks.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002).

Both sections 32(1) and 43(a) are subject to a defense of "fair use," and particularly, a defense that the use of the marks is a "nominative" or "descriptive" use of the marks to describe an aspect of the defendant's products or services. See EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc., 228 F.3d 56, 65 (2d Cir. 2000) (fair use defense to a section 43(a) claim); Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc., 166 F.3d 65,

73-74 (2d Cir. 1999) (fair use defense to a section 32(1) claim); see also 15 U.S.C. § 1115(b)(4) (fair use defense to use of an uncontestable registered mark where use of the mark is "a use, otherwise than as a mark, … which is descriptive of and used fairly and in good faith only to describe the goods or services …."). As the Court of Appeals for the Second Circuit explained, "fair use permits others to use a protected mark to describe aspects of their own goods." Nihon Keizai Shimbun, 166 F.3d at 73 (internal citation and quotation marks omitted).

ICE uses the marks NYMEX and NEW YORK MERCANTILE EXCHANGE in its product specifications to describe the source of the final settlement price for its OTC derivative contracts for Henry Hub natural gas and WTI crude oil. (Smith Decl. Ex. 24.) For example, NYMEX points to the title of ICE's cleared OTC contract for natural gas as "Natural Gas Swaps, Fixed for NYMEX LD1." (Id. at 2.) Because ICE uses NYMEX marks merely to describe economic aspects of its OTC derivative contracts, ICE's use of NYMEX's marks constitutes fair use of those marks. See EMI Catalogue P'ship, 228 F.3d at 65 ("Where a mark incorporates a term that is the only reasonably available means of describing a characteristic of another's goods, the other's use of that term in a

descriptive sense is usually protected by the fair use doctrine."); Nihon Keizai Shimbun, 166 F.3d at 73-74) (holding that defendant's use of the "Nikkei" mark to describe the source of defendant-created news abstracts was fair use of Nikkei's trademark); Mattel, Inc. v. Azrak-Hamway Intern., Inc., 724 F.2d 357, 361 (holding that the fair use defense "allows a competitor to use another's registered trademark to describe aspects of one's own goods").

NYMEX does not challenge the fact that ICE is using NYMEX's marks only to describe aspects of certain of ICE's OTC contracts. NYMEX does not point to any evidence of ICE's bad faith in describing its use of NYMEX settlement prices. The term NYMEX is plainly used to describe the source of settlement prices.

NYMEX asserts that the fair use defense is not available if ICE's use "creates a likelihood of confusion." This assertion is wrong as a matter of law, and, in any event, there is no evidence of such a likelihood of confusion. In Cosmetically Sealed Industries, Inc. v. Chesebrough-Pond's USA Co., 125 F.3d 28, 30 (2d Cir. 1997), the Second Circuit Court of Appeals held that "[f]air use is a defense to liability under the Lanham Act even if a defendant's conduct would otherwise constitute infringement of another's

trademark." Two years later in _Nihon Keizai Shimbun_, the
Second Circuit Court of Appeals reversed a judgment of
trademark infringement on the ground that the defendant's use
of the trademark was fair use, notwithstanding the district
court's determination that a likelihood of confusion existed.
166 F.3d at 73-74. More recently, the Supreme Court resolved
a split among the Circuit courts and held that in a trademark
infringement action alleging infringement of a registered
mark, "mere risk of confusion will not rule out fair use" and
"the defendant has no independent burden to negate the
likelihood of any confusion in raising the affirmative
defense" of fair use under 15 U.S.C. § 1114(b)(4). _KP
Permanent Make-Up, Inc. v. Lasting Impression I, Inc._, 125
S.Ct. 542, 550-51 (2004). The Supreme Court stated that
"some possibility of consumer confusion must be compatible
with fair use." _Id._ at 550.

The only two cases that NYMEX relies upon to argue that
likelihood of confusion prevents the application of the fair
use defense do not rule on the applicability of the fair use
defense. _See_ _Charles of the Ritz Group, Ltd. V. Quality King
Distributors, Inc._, 832 F.2d 1317 (2d Cir. 1987); _Weight
Watchers Int'l, Inc. v. Stouffer Corp._, 744 F. Supp. 1259
(S.D.N.Y. 1990). Both cases predate the Second Circuit Court

45

of Appeals' 1997 and 1999 rulings in <u>Cosmetically Sealed</u>
<u>Industries</u> and <u>Nihon Keizai Shimbun</u>, as well as the Supreme
Court's decision in <u>KP Permanent Make-Up</u>.

Moreover, NYMEX has not raised any issue of material
fact that a likelihood of confusion exists.  NYMEX
acknowledges that all of the participants on ICE's trading
platform are "eligible commercial entities" under the CEA.
(<u>See</u> Pl.'s Rule 56.1 Counter-Stmt. ¶ 44.)  Because these
entities are sophisticated commercial or institutional
organizations with substantial assets under management, <u>see</u> 7
U.S.C. §1a(11), these customers are not likely to believe
that ICE's OTC derivative contracts are sponsored or endorsed
by NYMEX because ICE refers to a NYMEX final settlement price
to describe contract specifications.  These sophisticated
commercial entities are less likely than untrained consumers
to be misled or confused by the similarity of different
marks.  <u>See</u> <u>Virgin Enters., Ltd. v. Nawab</u>, 335 F.3d 141, 151
(2d Cir. 2003).

Finally, NYMEX offered no evidence that ICE's
descriptive use of the NYMEX mark created actual customer
confusion.  The deposition testimony of two witnesses offered
by NYMEX, Charles Mackie and J. Robert Collins, establishes
only that, when ICE began offering cleared contracts, some

customers assumed that NYMEX provided the clearing services. The source of this confusion was explained as "really just ignorance" (Deposition of Charles Mackie dated Jan. 24, 2004 ("Mackie Dep.") at 93, attached at Vol. II, Ross Decl.), and may likely have been caused by the similarity of the products offered by ICE and NYMEX and the complexities that are generally involved in the energy trading industry, rather than as the result of ICE's descriptive use of the NYMEX mark. (Deposition of J. Robert Collins dated Jan. 10, 2004 ("Collins Dep.") at 213, 215, attached to Vol. II, Ross Decl.) Neither witness testified about any danger of ongoing confusion due to ICE's use of the NYMEX mark, but testified only to confusion in the period, in the spring or summer of 2002, when ICE began to offer OTC cleared contracts. (Mackie Dep. at 92-93,; Collins Dep. at 210.)

Therefore, summary judgment should be entered dismissing NYMEX's Second Claim for Relief.

**V.**

The Fourth and Fifth Claims for Relief allege causes of action arising under New York State law. ICE seeks summary judgment dismissing NYMEX's Fourth Claim for Relief, which alleges that ICE's use of NYMEX's marks in its OTC derivative contracts violates the New York State anti-dilution statute,

GBL § 360-l.  ICE and NYMEX have both moved for summary

judgment in their favor on NYMEX's Fifth Claim for Relief,

namely, that ICE tortiously interfered with the Market Data

Agreement ("MDA") between NYMEX and GlobalView.[14]  Because

all of the federal claims are dismissed, the Court declines

to exercise supplemental jurisdiction over these purely state

law claims.  See 28 U.S.C. § 1367(c)(3); Valencia ex rel.

Franco v. Lee, 316 F.3d 299, 304-06 (2d Cir. 2003).  It is

particularly appropriate to decline supplemental jurisdiction

over the remaining state law claims because they raise issues

of fact that are unnecessary to resolve for purposes of

deciding the federal claims.  The Fourth and Fifth Claims for

Relief are therefore dismissed without prejudice.

---

[14] NYMEX has withdrawn its Third Claim for Relief in its amended complaint
alleging that ICE violated the Federal Anti-Dilution statute, 15 U.S.C. §
1125(c).

## CONCLUSION

For the reasons explained, ICE's motion for summary judgment is **granted**, and NYMEX's cross-motion for summary judgment is **denied**. The Clerk is directed to enter judgment and to close this case.


**SO ORDERED.**

**Dated: New York, New York**
**September 29, 2005**

_____
John G. Koeltl
United States District Judge